# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| HEZEKIAH WHITFIELD, (B14293), | ) |
| Petitioner, | ) |
| | ) No. 17 C 8760 |
| v. | ) |
| | ) Hon. Marvin E. Aspen |
| JACQUELYN LASHBROOK, | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

Marvin E. Aspen, District Judge:

Petitioner Hezekiah Whitfield, a prisoner incarcerated at the Menard Correctional Center, brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 2014 murder conviction from the Nineteenth Judicial Circuit Court, Lake County, Illinois. (Dkt. 1.) He argues that the state court erred in: (1) its application of the harmless error standard regarding the failure to videotape his confession made to the police; and, (2) its preclusion of certain evidence that he wished to present at trial regarding James Edwards. For the reasons set forth below, the Court denies Petitioner's habeas corpus petition on the merits, and declines to issue a certificate of appealability.

## BACKGROUND

The Court draws the following factual history from the state court record. (Dkt. 9.) State court factual findings have a presumption of correctness, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 n.8 (2015) (citing 28 U.S.C. 2254(e)(1)). Petitioner has not made such a showing.

Petitioner was convicted of the 1994 murder of Fred Reckling. *Illinois v. Whitfield*, 78 N.E.3d 1015, 1018 (Ill. App. Ct. 2017). The prosecution's evidence at trial showed that on

December 9, 1994, Reckling's body was discovered at the Grand Appliance store that he owned in Waukegan, Illinois. *Id*. at 1018, 1026. His head had been beaten in. *Id*. at 1018. The murder appeared to have occurred during the course of a robbery.

Reckling was last seen at his church the night before around 8:30 p.m. *Id*. at 1026. He left the church driving his black Lincoln Town Car. *Id*. Reckling's practice was to work on paperwork in the store during the evenings. *Id*. at 1026-27. He would also drop the day's deposits off at the bank on the way home. *Id*. at 1027. Additionally, one of Reckling's employees, who had borrowed $20 dollars from Reckling the day before his murder, saw that Reckling's wallet was full of cash, estimating it to be several hundred dollars. *Id*. at 1027.

On the day that Reckling's body was discovered, a customer and employee arrived around 8:15 a.m. *Id*. at 1026. They observed signs of a disturbance by the store's front door (glass from a shattered fluorescent light bulb and a ladder lying on the floor), and that Reckling's Lincoln Town Car was not in his normal parking spot. *Id*. at 1027. Reckling routinely arrived to work by 8:00 a.m. *Id*. at 1026. Reckling's car was also not at his home. *Id*. at 1027. It had snowed the night before, and there were no tire tracks in either Reckling's home driveway, or in his store parking spot. *Id*.

The store's front door was unlocked, and there was a faint alarm. *Id*. at 1026. The store had a security alarm, but it was not connected to the police department due to technical glitch. *Id*. at 1027. The alarm would sound loudly for fifteen minutes, and then switch to a quieter sound. *Id*. Upon entering the store, the employee and customer found a number of papers on the floor including customers' checks, credit card slips, and deposit slips. *Id*. The deposit slips indicated a cash deposit of $1700, but no cash was found in the store, and the bank deposit bag was missing. *Id*.

Reckling's body was discovered lying motionless near the refrigerators with blood pooled under his head. *Id*. He was wearing his clothes from the night before including his jacket as if he had been preparing to leave the store. *Id*. Reckling suffered scalp and head wounds. *Id*. There were blood splatters on a nearby refrigerator door along with gouges on the door. *Id*. at 1028. A forensic expert testified that the evidence suggested that Reckling was bludgeoned to death with a metal object. *Id*. Four blood "droplet-type" stains were recovered from the carpet by the store's front door. *Id*.

Reckling's Lincoln Town Car was spotted the next day parked on a residential side street on Chicago's northside. *Id*. A local resident would eventually call the police reporting the vehicle abandoned. *Id*. The police found that the spare tire was on the car, and there were grocery bags in the back of the car. *Id*. at 1029. The grocery bags were from Franklin Food in Waukegan, a store at which Reckling often shopped. *Id*. Blood stains were also discovered on the car's steering wheel, on the driver's seat, and the floor between the driver's side door and seat. *Id*. at 1030.

Two days after the car was recovered by police, Illinois State Toll Highway Authority workers found Reckling's wallet on Interstate 94 near an onramp at Route 60.[1] *Id*. at 1029. The wallet contained Reckling's driver's license. *Id*. Previously, on the day that Reckling's body was discovered at his store, a second tollway worker found jumper cables from Reckling's car at the southbound entrance ramp to Interstate 94 at Route 60. *Id*. A tire, rim, and car jack stand were also discovered at the intersection. *Id*. The jack was missing from Reckling's car when the police recovered his car in Chicago. *Id*. at 1030.

---

[1] The intersection of Interstate 94 and Route 60 is south of Waukegan on the way towards Chicago.

The police passed out flyers at the intersection of Interstate 94 and Route 60 in an attempt to locate eyewitnesses. *Id.* at 1029. The police located three eyewitnesses. The first, Jason Howell, worked at a local mall on the evening of Reckling's murder. *Id.* He drove past the intersection of Interstate 94 and Route 60 around 11:30 p.m. or midnight that evening. *Id.* He witnessed two cars on the side of the road, one in front of the either. *Id.* A red compact car was in front, and the black Lincoln was in the rear. *Id.* A person wearing black clothes and a white hat was bending over the rear of the Lincoln, but Howell could not make out the person's features. *Id.* Howell saw a second man, who was white and in his 30s, getting out of the red compact car. *Id.* Petitioner is African American. *Id.* at 1035. (The other two witnesses, Michael and Holly Wales, were presented in the defense case discussed below).

Regarding the recovered blood evidence from the store and victim's car, the crime laboratory during that period could only perform tests identifying blood type and certain genetic markers for blood enzymes. *Id.* at 1030. The lab did not perform DNA testing at that time. *Id.* Beyond the blood evidence, the police also recovered various fingerprints from the store, car, and items recovered on the highway. *Id.* at 1033.

A little more than a year after Reckling's murder, James Edwards was arrested for a series of robberies in the Waukegan area. *Id.* at 1018. He also confessed to murdering Reckling. *Id.* Edwards was convicted with the confession being the sole source of evidence against him. *Illinois v. Edwards*, 704 N.E.2d 982, 985 (Ill. App. Ct. 1998). In 2011, Edwards was cleared of the crime after it was shown that neither his fingerprints, nor his DNA matched the recovered fingerprint and blood evidence. *Whitfield*, 78 N.E.2d at 1018, 1031, 1033.

Following the dropping of the charges against Edwards, the blood evidence was compared to the FBI's Combined DNA Index System ("CODIS") database, which revealed a probable match to Petitioner. *Id.* at 1018. The Waukegan police procured a warrant to obtain a

DNA sample from Petitioner. *Id*. at 1030. In June 2011, the Waukegan police stopped Petitioner while he was driving, and took him to the hospital to obtain the sample. *Id*. at 1030-31.

Testing later revealed that all fifteen loci from the car DNA matched Petitioner, and that the odds of this match occurring randomly would be one in 22.3 sextillion African Americans. *Id*. at 1031. The DNA from the store's carpet only had fourteen loci, however, and although the store carpet DNA was consistent with Whitfield's DNA, the expert only used the term "match" when all fifteen loci could be compared. *Id.* (the expert nonetheless noted the chance of this match occurring randomly as "astronomical"). There was no innocent explanation as to how Petitioner's blood could end up in the store and car as he did not live or work near the store, and had never been a customer or employee of the store. *Id*. at 1039.

Shamiya Mathis, a woman Petitioner had begun dating a few months earlier, was riding with Petitioner when he was stopped by the police for the collection of the DNA sample. *Id*. at 1018. The police returned Petitioner to his vehicle after securing the sample, and he and Mathis drove away. *Id*. at 1032. Mathis testified that Petitioner was shaking, smoking cigarettes, and crying when he returned following the police taking his DNA sample. *Id*. at 1031. She asked him what was wrong, and he confessed to Reckling's murder. *Id*. Petitioner related that he was on heroin at the time, and was looking for someone to rob. *Id*. He hit Reckling over the head three times with a gun, and then took his wallet, car, and some money from the register. *Id*. Petitioner explained the he got a flat tire as he drove towards to Chicago, and flagged down someone to help him change the tire. *Id*.

A few days after the police took Petitioner's DNA sample, he called Mathis asking that she search the Internet to see if he was wanted for murder. *Id*. She told him no. *Id*. Petitioner contacted Mathis a few weeks later to repeat the Internet search, and again she said there was no indication he was wanted. *Id*.

In July 2011, Petitioner called Mathis and told her he was in Indonesia. *Id*. She then went to the Waukegan police telling them what Petitioner had told her. *Id*. She learned about the crime on the Internet during this period. *Id*. It also appears that Mathis's relationship with Petitioner soured after she learned that Petitioner married a woman while in Indonesia. *Id*. at 1033.

Despite this, Petitioner and Mathis saw each other again in Chicago in April 2012. *Id*. at 1032. Mathis claims she attacked Petitioner with a pipe in self-defense during the April 2012 incident because Petitioner had tried to cut her. *Id*. The Chicago police took both Mathis and Petitioner to the police station. *Id*. at 1031. Petitioner was taken to the station after declining medical care at the hospital. *Id*. at 1018.

Mathis was transported to a police station by Chicago police officer Jacquelyn Spaargaren. *Id*. at 1018. On the way to the station, Mathis told Spaargaren that Petitioner was wanted for murder in Waukegan. *Id*. at 1031. At the station, Spaargaren *Mirandized* Petitioner and questioned him about the Waukegan case. *Id*. Spaargaren testified at trial that Petitioner told her, "they DNA tested me for murder in Waukegan, and then I found out they knew that I did it, I left out to Indonesia." *Id*. He then told her he did not want to talk anymore, and she stopped the questioning. *Id*. Spaargaren conceded that she did not videotape Petitioner's statement as required by Illinois law, but claimed she was not covered by the Illinois requirement because she was a patrol office, as opposed to a detective. *Id*.

In sum, the prosecution's strongest evidence against Petitioner was Petitioner's DNA matching the blood found in the store and Reckling's car. Additionally, there was Petitioner's confessions to Mathis and Spaargaren.

The defense presented testimony from Michael and Holly Wales. The Wales were the two other eyewitnesses who drove through the intersection of Interstate 94 and Route 60 on the

6

night of the murder. They passed through intersection around 10:30 p.m. that evening. *Id*. at 1033. They worked together and were each driving their respective cars home with Holly following directly behind Michael. *Id*. They both only saw one car at the intersection. *Id*. Michael Wales said it was a black car, while Holly Wales identified it as a "dark nice car, a larger style." *Id*.

By a matter of apparent coincidence, Michael Wales and Petitioner had been in culinary school together in 1993 in Evanston, but Wales said he had not seen or heard from Petitioner in the intervening two decades. *Id*. Michael Wales explained that he recognized Petitioner's name when he received his trial subpoena for Petitioner's 2014 murder trial. *Id*. He said he was positive that he saw a white man in a hoodie standing by the car, and that it was not Petitioner. *Id*.

The defense also presented James Edwards' confession to the Reckling murder, as well as evidence that a white man appeared to be casing a neighboring business on the night of the murder. *Id*. at 1034.

In closing arguments, the prosecution emphasized the DNA evidence arguing that there was no innocent explanation for why Petitioner's blood was both in the store and in Petitioner's car. *Id*. The prosecution also pointed to Petitioner's two confessions to Mathis and Spaargaren, and Petitioner's flight to Indonesia. *Id*.

The defense countered in closing that there were multiple witnesses who said they saw a white man, not an African American, changing the Town Car tire. *Id*. As to the DNA evidence, the defense argued there was no evidence as to how old the blood evidence was, or how it was deposited in the store or car. *Id*. Additionally, the defense pointed out there no blood or fingerprint evidence on the items the murderer would have handled that evening such as the

7

spare tire and tire jack. *Id*. The defense also argued that Edwards confessed to the crime, and that Mathis and Spaargaren were not believable. *Id*.

The jury sent out a note during its deliberation asking to see Spaargaron's report regarding Petitioner's confession to her. *Id*. The trial court refused the request and told the jurors to keep deliberating. The jury found Petitioner guilty, and his conviction was affirmed on direct appeal. He now brings the present habeas corpus petition.

## ANALYSIS

### 1. Claim One: Challenge to the Harmless Error Standard applied by the Appellate Court of Illinois

Claim One arises out of Petitioner's pretrial motion *in limine* to bar the state from introducing his confession to Chicago police officer Spaargaren. *Id*. at 1019. The motion *in limine* invokes 725 ILCS 5/103-2.1. *Id*. This statute prohibits the use of a statement made during custodial interrogation at a police station or other place of detention in a murder trial unless the statement was electronically recorded. 725 ILCS 5/103-2.1(b-5). However, "the presumption of inadmissibility" "may be overcome by a preponderance of the evidence that the statement was voluntarily given and is reliable, based on the totality of the circumstances." 725 ILCS 5/103-2.1(f).

The state trial court held a multi-day hearing on the motion receiving testimony from three police officers (including Spaargaren), and also from Petitioner. In sum, the officers testified that they found Petitioner walking in an alley with a laceration on his head and blood on his shirt when responding to the domestic violence call. *Id*. at 1020. The officers saw no sign that Petitioner was under the influence of drugs or alcohol, and was calm other than the agitation caused by the assault. *Id*. (Petitioner said he had a small amount of alcohol prior to the incident with Mathis. *Id*. at 1023.) He also did not complaint about being in any pain. *Id*. at 1020.

Petitioner was 42 years old and had finished three years of college at the time of the incident. *Id*. at 1022.

Petitioner initially refused to be taken to the hospital, but the police transported him per protocol. *Id*. at 1021. He was observed by a doctor who signed off on Petitioner's refusal to accept treatment. *Id*.

Petitioner was then brought to the police station where he was handcuffed to a bench in a processing room. *Id*. The room is 15 by 20 feet with four computers and two benches. *Id*. Petitioner was conscious, did not complain of pain, or request water, food, or to use the bathroom. *Id*. Petitioner remained in the processing room for the next ten to fifteen minutes while two of the officers worked on typing up a report. It was during this time that Spaargaren spoke to Petitioner. *Id*.

Spaargaren, having received Mathis's statement in the squad car that Petitioner was involved in the Waukegan murder, spoke to Petitioner while he was handcuffed to the bench in the processing room. *Id*. She explained that she *Mirandized* Petitioner "off the top of her head." *Id*. She then raised his alleged involvement with the Waukegan murder to which Petitioner mentioned that he had his DNA tested, and that he had fled to Indonesia. *Id*. Petitioner then said he did not want to talk anymore, and Spaargaren terminated her questioning. *Id*. Spaargaren conceded that she did not obtain a written statement from Petitioner regarding his *Miranda* rights. It was somewhat loud in the processing room, and the two other officers said they did not hear the substance of Spaargaren's conversation with Petitioner. *Id*. at 1021-22.

Petitioner refuted Spaargaren's testimony stating that he did not confess to her. *Id*. at 1022. He also said that he did not recall Spaargaren or anyone else explained to him his *Miranda* rights. *Id*. at 1023. He did agree that none of the officers used physical force or threatened him in any way. *Id*. Petitioner stated that the questioning by Spaargaren lasted five

9

minutes, and he refused to answer her questions. *Id*. at 1022. Petitioner was held at the station until the next morning. *Id*. at 1023. He went to the hospital and received five stiches following his release. *Id*.

The trial court denied the motion *in limine* holding that although Spaargaren failed to record Petitioner's statement as required by Illinois law, 725 ILCS 5/103-2.1(b-5), the presumption that the statement was inadmissible was overcome by the prosecution's showing that Petitioner's statement was voluntarily given and reliable, 725 ILCS 5/103-2.1(f). *Whitfield*, 78 N.E.3d at 1025

In finding the statement was voluntary, the trial court said that it saw no evidence that Petitioner was intoxicated, suffering from a physical disability, or was subject to undue coercion of any type of lengthy custodial interrogation that would make his statements involuntary. *Id*. The trial court also found that Petitioner was *Mirandized* at the time he gave the statement. *Id*.

On appeal, the appellate court explained that the trial court's analysis was incomplete. *Id*. at 1038. According to the appellate court, the trial court focused predominately on the voluntariness question without giving sufficient attention to the question of whether the statement was also reliable. *Id*. The reliability question was also in dispute because Petitioner disputed Spaargaren's testimony that she had *Mirandized* him, and that he had confessed as she claimed. *Id*. This dispute was heightened by the fact that the two other police officers said they had not heard the conversation between Petitioner and Spaargaren. *Id*.

Despite the concerns over the trial court's failure to perform a full reliability analysis, the state appellate court held that it need not go further because any error was harmless. *Id*. The state appellate court, the last court to rule on the issue, applied a harmless error standard of:

> An evidentiary error is harmless if it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained, or when no reasonable

probability exists that the jury would have acquitted the defendant absent the error.

*Whitfield*, 78 N.E.3d at 1039 (internal quotation marks and citations omitted).

In finding any error harmless, the appellate court concluded that "[b]y far, the most damning evidence against the defendant was the DNA evidence . . . ." *Id*. That court explained that the blood evidence in both the store and the victim's car resulted in a "match that was astronomically unlikely to occur randomly." *Id*. This is "overwhelming evidence." *Id*. Additionally, the state court noted Petitioner's confession to Mathis. The state appellate court concluded that, "there is no reasonable probability that the jury would have acquitted the defendant even if the motion *in limine* had been granted." *Id*. at 1040.

Petitioner argues in Claim One that the appellate court applied the wrong harmless error standard. (Dkt. 1, pgs. 17-21.) The problem that Petitioner faces is that the appellate court was considering whether a trial court error in the application of a state statute was harmless. As a general principle, state law errors are not cognizable in a federal habeas corpus proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Illinois's Recording Law, 725 ILCS 5/103-2.1, mandating that confessions resulting from custodial interrogations are presumptively inadmissible unless they are recorded is not required by the United States Constitution. *United States v. Thurman*, 889 F.3d 356, 366 (7th Cir. 2018), *petition for cert. filed*, No. 18-5528 (U.S. Aug. 9, 2018); *United States v. Montgomery*, 390 F.3d 1013, 1017 (7th Cir. 2004) (holding that although some states, including Illinois, now require the recording of custodial interrogations, this requirement is not required by the United States Constitution, and "we see no hint that the Supreme Court is ready to take such as major step."). Thus, the question of whether 725 ILCS 5/103-2.1 was violated with the introduction of his confession is a non cognizable issue for a federal habeas corpus petition because Illinois's

11

prophylactic measure is not required by the Constitution. Nor does the state appellate court's application of the state's harmless error standard implicate a constitutional concern because a state court ruling as to whether a ruling of state law is harmless implicates only state law. *Connecticut v. Johnson*, 460 U.S. 73, 89 n.2 (1983) (Stevens, J., concurring) (explaining that states apply their own harmless error law when evaluating state law errors and that is an issue of state law separate and distinct from the harmless error standard used for review of federal constitutional errors); *Atterberry v. Korte*, No. 16 C 3063, 2017 WL 55263251, at *5 (N.D. Ill. Nov. 9, 2017) (same). In sum, Claim One is fails because it raises a non cognizable issue of state law.

For completeness purposes, the Court notes that the Petitioner would be unsuccessful if the Court's foregoing analysis --- that the state appellate court's decision did not implicate a federal constitutional right --- is incorrect. Even if the state appellate court misapplied the federal constitutional harmless error standard of *Chapman v. California*, 386 U.S. 18 (1967), as Petitioner alleges, he would still be unable to meet the standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993). "[I]f the state court never conducted the harmless error analysis or otherwise applied *Chapman* unreasonably, the federal court must make an independent decision as if the state court never addressed the subject at all. Hence, here, the *Brecht* standard is appropriate in determining if the error was harmless." *Brown v. Rednour*, 637 F.3d 761, 766 (7th Cir. 2011) (citing *Johnson v. Acevedo*, 572 F.3d 398, 404 (7th Cir. 2009)); *see also*, *Davis v. Ayala*, 135 S. Ct. 2187, 2198-99 (2015).

*Brecht* establishes the harmless error standard applied in habeas corpus cases of an error is harmless unless it had a substantial and injurious effort or influence in determining the jury's verdict. *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (citing *Brecht*, 507 U.S. at 631). As the state appellate court explained, the DNA was "the most damning evidence" against Petitioner, and

found the evidence "overwhelming" considering Petitioner neither lived nor worked near Reckling's store. *Whitfield*, 78 N.E.3d at 1039. We agree with the Illinois Appellate Court that the strength of the other physical evidence in this case, including DNA evidence from the scene of the crime and the victim's vehicle, meant that there is no reasonable doubt the jury would have acquitted Petitioner absent the admission of his challenged confession. *Whitman v. Bartow*, 434 F.3d 968, 971 (7th Cir. 2006) ("[T]rial errors are often found harmless where the record is replete with overwhelming evidence of the defendant's guilt.").

Furthermore, even if Mathis was partially impeached, her testimony recounted Petitioner's confession to the same crime. *Whitfield*, 78 N.E.3d at 1039–40. Mathis' testimony also provided much more detailed evidence about Petitioner: while Spaargaren testified Petitioner said the police knew he committed "a murder in Waukegan," Mathis testified that Petitioner admitted detail about the time, location, injury to the victim, age of the victim, and that he took the victim's car but later got a flat tire. *Id.* at 1032. Given Mathis' testimony, Petitioner's confession to Spaargaren is cumulative. *Brown v. Rednour*, 637 F.3d 761, 766 (7th Cir. 2011).

Petitioner specifically argues that the note from the jury asking for Spaargaren's police reports means the jury necessarily considered Petitioner's confession in rendering their verdict. (Reply at 17–18.) We agree that the jury undoubtedly contemplated or discussed Spaargaren's testimony when deliberating. However, merely proving the jury considered inadmissible evidence does not mean harmless error occurred. *See Brown*, 637 F.3d at 767 (finding harmless error under *Chapman* after the jury accidentally was given an inadmissible police report that a sheriff witnessed a juror reading , and after it was removed from the juror room, the jury later sent a note to the judge requesting the report). Considering the strength of the other evidence in the case and the cumulative nature of the substance of Spaargaren's account, any alleged error did not have a substantial and injurious effect on the verdict.

13

In sum, Claim One raises a non cognizable issue of state law. But even if Petitioner did raise a cognizable issue, any error by the state court was harmless under the *Brecht* standard. The evidence of Petitioner's guilty is overwhelming. Claim One is denied.[2]

---

[2] Respondent's answer frames Claim One as asserting that Petitioner's confession to Spaargaren was given involuntarily resulting in a due process violation from its introduction at trial. (Dkt. 8, pg. 5.) However, as discussed above, Petitioner's claim was that the state court erred its application of harmless error when allowing the introduction of his confession under Illinois's Recording Law. (Dkt. 1, pgs. 17-21.)

Respondent's improper framing of the claim resulted in a red herring in the parties' briefing. Respondent argued that Petitioner failed to exhaust a federal involuntary confession claim before the state courts because Petitioner had only raised the Illinois Recording Law issue in the state courts. (Dkt. 8, pgs. 5-6.) Petitioner countered that his claim was properly exhausted because *Miranda* caselaw was cited through the parties' briefing before the state appellate court, and in the state appellate court decision. (Dkt. 11, pg. 6.)

The problem with the Petitioner's argument is that the Illinois Recording Law draws upon *Miranda* case law for determining whether a statement is giving voluntarily and reliable so as to be admissible even when the statement is not videotaped. *Illinois v. Harris*, 977 N.E.2d 811, 821-22 (Ill. App. Ct. 2012). Illinois has chosen to use *Miranda* case law in the implementation of an Illinois statute; it is not using *Miranda* case law to carry out a federal constitutional requirement because, as explained above, there is no federal requirement that confessions be recorded. In fact, Illinois courts recognize this fact by "[emphasiz[ing] that *Miranda* case law serves only as a *guidance*; it is not determinative." *Harris*, 977 N.E.2d at 821-22 (emphasis in original).

Finally, for completeness purposes, the Court notes that even if it misunderstands the claim, and Petitioner is actually trying to raise a federal involuntary confession claim, this claim would be baseless. There is nothing in the record to suggest, based on the totality of the circumstances, that there was any type of coercion resulting in Petitioner's statement to Spaargaren. *See Dassey v. Dittmann*, 877 F.3d 297, 303-304 (7th Cir. 2017) (en banc). There is no allegation that Petitioner was physically or mentally coerced into confessing to the police. He was offered medical care for his injury (that he declined), and was in police custody for less than 24 hours. There is also nothing in the record to refute the state court's ruling that Petitioner received *Miranda* warnings before being questioned by Spaargaren.

## 2. Claim Two: State Court's Exclusion of Evidence Regarding James Edwards

Petitioner's remaining claim involves his attempt to introduce evidence regarding the police's questioning of James Edwards. As discussed above, Edwards was originally convicted of Reckling's murder, but he was later cleared after it was found that his DNA did not match the blood evidence at the crime scene and the victim's car. The defense at Petitioner's trial called the police detectives who questioned Edwards in order to present Edwards' confession to the jury in an attempt to establish reasonable doubt. *Whitfield*, 78 N.E.3d at 1034. Thus, the traditional positions taken by a prosecutor and defense counsel were effectively flipped in this case. It was the defense attorney attempting to enter a confession into evidence through a police officer's testimony, while the prosecutor was trying to limit the impact of the confession before the jury.

The prosecutor took multiple steps to limit Edwards' confession. He argued the confession was not supported by the DNA evidence. *Id*. at 1041. The prosecution also attempted to emphasize on cross-examination the inconsistencies between Edwards' confession and the evidence at the crime scene. *Id*. at 1034. Finally, the prosecution moved to preclude a discussion of Edwards' other crimes before the jury. *Id*. at 1040. The limitation on other crime evidence is what is at issue in this claim.

As to the other crime evidence, the prosecution moved to bar both testimony regarding the fact that Edwards committed a series of robberies prior to his arrest, and questioning about the robberies that resulted in his confession to the police. *Id*. The prosecution believed the evidence was irrelevant because the circumstances of Edwards' other robberies were too dissimilar to the robbery in this case. *Id*.

The defense responded that exclusion of the robbery cases would create a false impression before the jury. *Id*. The police questioned Edwards first about the robberies, and the murder confession did not occur until more than 24 hours after his arrest. *Id*.

15

The trial court ruled that Edwards' other crime evidence was not relevant to Petitioner's trial because those crimes were too dissimilar, and there was no indication that Edwards' robberies were intertwined with Reckling's murder. *Id*. The trial court, however, instructed the prosecution to not give the false impression that the officers had only been questioning Edwards about the murder. *Id*. The officers would testify that they questioned Edwards about "other matters" before questioning his about the murder. *Id*.

On appeal before the state appellate court, the last court to consider Petitioner's claim on the merits, Petitioner raised what one could characterize as a "what's good for the goose is good for the gander" type argument.[3] Petitioner pointed out that the prosecution explicitly used the evidence of Edwards' robberies in Edwards' case while taking the opposing position in his case. *Id*. at 1041. Edwards had accused the police of fabricating his confession, and the prosecution used the robbery other crime evidence in an attempt to bolster authenticity of the confession before the jury in his case. *Id*. Petitioner argued that he should be able to take the same approach of using Edwards' robberies in an attempt to bolster the credibility of Edwards' confession in an attempt to establish reasonable doubt at his trial. *Id*.

In rejecting Petitioner's claim, the state appellate court held that pursuant to *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), Petitioner had a due process right to introduce evidence that someone other than him --- Edwards --- confessed to murdering Reckling. *Whitfield*, 78 N.E.2d at 1040. The state appellate court, however, rejected Petitioner's argument that the fact that other crime evidence was admissible in Edwards' case as it related to his confession should also mandate the admissibility of this same evidence in Petitioner's case. *Id*. at 1041. In sum,

---

[3] Neither the parties nor the state court used the "good for the goose, good for the gander" phrase the Court now uses. It is doing so now simply for illustrative purposes.

the state court concluded that Petitioner's right was limited to the introduction of only Edwards' confession. *Id*. at 1042.

Petitioner now renews this argument in Claim Two before this Court that he should have been allowed to introduce the other crime evidence regarding Edwards' robberies for the purposes of bolstering Edwards' confession before the jury. As this claim was adjudicated by the state appellate court, the Court's review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Petitioner cannot obtain relief unless he can show that the "state court decision is 'contrary to' or 'an unreasonable application of' clearly established federal law." *Burr v. Pollard*, 546 F.3d 828, 831 (7th Cir. 2008) (quoting 28 U.S.C. § 2254(d)(1)). Under the AEDPA, a state court decision is "contrary to" Supreme Court precedent when it applied a rule different from controlling law set forth in Supreme Court precedent, or if it reaches a different decision than the Supreme Court has already reached on "materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *see also Burr*, 546 F.3d at 831. "A state court unreasonably applies clearly established law if it 'identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case.'" *Id*. (citing *Williams*, 529 U.S. at 413). For a state court's application to be "unreasonable," it must have "been more than incorrect or erroneous," and must be "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Under either prong, the prisoner bears the burden of establishing he is entitled to habeas relief. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Habeas review is deferential to state courts; we must "attend closely" to state court decisions and "give them full effect when their findings and judgments are consistent with federal law." *Williams*, 529 U.S. at 383. Accordingly, because we must defer to state court decisions "to a great extent," habeas relief of a state criminal conviction is "not easy to come by." *Thompkins v. Pfister*, 698 F.3d 976, 983 (7th Cir. 2012).

The Constitution guarantees a defendant the right to present a complete defense, but this is not an unfettered right as the states have board latitude in establishing evidentiary rules governing the admissibility of evidence at trial. *Caffey v. Butler*, 802 F.3d 884, 895 (7th Cir. 2015) (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). *Chambers*, along with a line of Supreme Court cases building upon it, are understood as guaranteeing a defendant's right to introduce evidence and testimony on his own behalf as long as that evidence is "essential to the defendant's ability to present a defense." *Kubsch v. Neal*, 838 F.3d 845, 858 (7th Cir. 2016) (en banc). The evidence that defendant wishes to present must be reliable and trustworthy. *Id*. However, state evidentiary rules still apply to preclude a defendant's introduction of evidence that is "cumulative, impeaching, unfairly prejudicial, or potentially misleading." *Id*. Finally, and most noteworthy to this case, the state court's exclusion of evidence "cannot operate in an arbitrary manner. . . . Arbitrariness might be shown by a lack of parity between the prosecution and the defense; the state cannot regard evidence as reliable enough for the prosecution, but not for the defense." *Id*.

With these principles in mind, the Court turns to the state appellate court ruling. The state decision is not contrary to the relevant constitutional standard. The state court recognized that the issue is one involving Petitioner's ability to present a defense while balancing the state's court's right to regulate the introduction of evidence. The state court also cited to, and discussed, the relevant Supreme Court standard. Petitioner cannot demonstrate the state court ruling was contrary to clearly established federal law.

The unreasonable application prong of the analysis is a much closer call. The reason is that there are two competing principles at issue in this case. On one hand, the state court decision is consistent with Supreme Court principles in that the state court is allowing the prosecutor to

exclude potentially misleading information. However, the fact that the prosecutor argued for the introduction of this same material in Edwards' case while taking the opposite position in Petitioner's case suggests an impermissible arbitrariness as demonstrated by a lack of parity between the state court's treatment of the prosecutor and defendant.

However, the Court's resolution of this case is governed by the AEDPA's demanding standard. The AEDPA requires the state court's resolution of the issue to be objectively unreasonable. *Williams*, 529 U.S. at 383. In light of the closeness of the issue, the Court cannot say that Petitioner has met the AEDPA's rigorous standard.

Finally, even if the Court could meet the AEDPA standard, he would still be unsuccessful as a *Chambers* claim is subject to review under *Brecht*. *Fry*, 551 U.S. at 115, 120. As discussed in Claim One, Petitioner cannot meet the substantial and injurious effort or influence in determining the jury's verdict *Brecht* standard. Although the jury did not hear about the other crimes evidence involving Edwards, they did hear that he confessed to the murder. Additionally, as discussed above, the evidence against Petitioner was overwhelming. Claims Two is denied. The habeas corpus petition is denied on the merits.

### 3. Certificate of Appealability and Notice of Appeal Rights

The Court declines to issue a certificate of appealability. Petitioner cannot make a substantial showing of the denial of a constitutional right, or that reasonable jurists would debate, much less disagree, with this Court's resolution of Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this

Court's ruling to preserve his appellate rights. However, if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## CONCLUSION

Petitioner's habeas corpus petition (Dkt. 1.) is denied on the merits. Any pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to: (1) correct the spelling of Respondent's name on the docket as Jacqueline Lashbrook, and, (2) enter a judgment in favor of Respondent and against Petitioner. Civil Case Terminated.

ENTERED:

_____
Marvin E. Aspen
United States District Judge

Dated: September 12, 2018
Chicago, Illinois